Upon the argument with which we have been favored in this case the matter was made to turn upon two points:
1. Whether the status of petitioner, as a free negro, continued, notwithstanding the deed entered into with James R. Love.
2. Whether, as a free man, he could be conscribed for such services as are indicated in the act of Congress of 17 February, 1864 (1 Cong. 4th sess., ch. 79, sec. 1).
The part of the act pertinent to our inquiry is in the following words: "That all male free negroes, and other persons of color, resident in the Confederate States, between the ages of 18 and 50 years, shall be held liable to perform such duties with the army, or in connection with the military defenses of the country, in the way of work upon fortifications, or in Government works for the production or preparation of material of war, or in military hospitals, as the Secretary of War may (436) from time to time prescribe; and while engaged in the performance of such duties shall receive rations and clothing, and compensation at the rate of $11 a month, under such rules and regulations as the said Secretary may establish."
It is admitted that the Government does not proceed against the petitioner as one bound to serve as a slave, and who may, therefore, under the act of Congress, be impressed; but it claims him as a free negro, subject to be conscribed, and to do duty under the section of the act which has just been quoted.
The petitioner contends that the effect of the deed to Love is to degrade him from the condition of a free man and, by consequence, to withdraw him from liability to conscription for military service.
In Phillips v. Murphy, 49 N.C. 45, it was decided that a deed made by a free negro, of his services for a term of years, did not operate to make a slave of him, or to pass a property in him, but simply to give the grantee a right to his services upon an executory agreement, for a breach whereof an action of covenant would lie. So, in the case before us, the deed for service for a term of years does not alter the social or political condition of the negro. No other or different legal consequences result from his agreement than if it had been entered into by a white man. Both, upon a breach of it, are subject to be sued for damages. Neither is subject to have enforced against him a specific execution.
Besides the direct authority I have quoted, it may be observed that the petitioner can only maintain his suit upon the assumption that he is a free man. There is no middle ground upon which he can stand. He is either a slave or a free man. If the latter, he is of the class intended to be embraced by the first section of the act of 17 February, 1864; if the former, he cannot sue, but his suit must be dismissed and he remitted to *Page 281 
custody. If he says, I am a free man, he abandons this point; if he says he is a slave, his declaration puts him out of court.
2. The question in the second place seems to be based upon the (437) idea that all men must be put into the army upon a footing of equal rights, and be permitted to choose the arm of service to which they will respectively attach themselves. This, we think, is a palpable mistake. The organization of an army consists in dividing it into parts, and assigning these parts to different modes of service. This is essential to give it efficiency, and to distinguish it from a fighting mob.
Without descending to minute divisions, there is found in every army a body of infantry, who are on foot and armed with the musket and rifle; a body of cavalry, who are on horseback and armed with saber and pistol; a body of artillery, who are in charge of the cannon, and a body of engineers, who are not armed at all, but with spade and shovel and pickaxes are in charge of fortifications, sapping and mining, and the like. Here are varieties of service, of unequal eligibility; and yet the public authorities, without question of right, assign men to these departments as they deem them best fitted for one or another, whether they will or no. If this can be done by executive and ministerial officers of the law, surely it can be done by the law itself. If regulations made by the War Department, as incidental to its power to organize an army, can justify an arbitrary assignment, the organic law itself can prescribe such regulations.
So it is entirely competent, according to regulations and the unquestioned usages in the army for officers to detail or assign men for the performance of work on the fortifications, in the workshops, producing the material of war, and in the hospitals for taking care of the sick and wounded; and it seems plain, if this thing can be done as an incidental power, of which there has never been any question, the detail may be preordained by the law authorizing the force to be raised.
We can perceive no reason why the law, in authorizing the levy (438) of troops from time to time, may not provide that any portion of these (the latest conscripts, for instance) shall be employed in the least responsible positions; that is, on the fortifications, in the shops and hospitals, and as wagon and ambulance drivers.
By an examination of the act (19 February, 1864, ch. 79) it will be seen that what is here indicated is all that has been attempted by Congress. For the purpose of giving greater efficiency to the army, by preventing the withdrawal of men from the field, the act authorizes the conscription of free negroes for the purpose of performing duty "with the army, and in connection with the military defenses of the country," in working on fortifications, in workshops, hospitals, etc. If these *Page 282 
duties could be assigned the free negroes after they got into the army (of which there seems to be no question), a fortiori, could they be assigned to these duties by the law conscribing them.
We have been willing to put the case of the petitioner upon the most favorable ground, and to consider it as the case of a white man, entitled to all the rights and privileges of the race; and with respect to him in that point of view, the law is constitutional and proper to be enforced.
When we consider the difference, before the law, between the social and political conditions of the races, how it has been its uniform policy to keep them separate socially, the law appears to be now eminently proper. Its special features seem to be in conformity only to the unbroken system of our legislation, and to be necessary to preserve homogeneity in our social fabric.
When it became necessary, therefore, as it is declared to be in the preamble to this and other acts of the Congress; passed at the (439) same session, to conscribe or impress negroes for military duty, it was a requirement of social order that they should be brought in in such way as not to violate the distinction of race. It would not have been proper, and according to usage, to mix them with the whites in such way as to compel social equality.
The idea of equal rights, upon which the petitioner's case seems to be based, is not practicable in the government of an army.
Troops, to give them efficiency, must be moved by one head. The unexperienced and excitable may be kept in the rear, while veterans may be selected, at the will of the commander, to occupy the posts of danger. Regiments, proved to be untrustworthy in the hour of trial, may be removed from the post of honor, and their places supplied with others who have been found more reliable. Individuals whose dispositions or whose loyalty may be suspected may be removed from opportunity and temptation, by being detailed for service in the rear, as cooks, teamsters, nurses, and the like. It has never been imagined that the different divisions of the army could be permitted to contend or by any means determine for themselves their respective positions and duties in the same.
There can be but little room in an army for the enjoyment of civil rights. Its government is necessarily absolute, and, in most respects, according to the will of a single mind, the great and paramount duty being to give it force and rapidity of action, and to guard it against dangers, internal and external.
Our conclusion, then, is:
1. That the first section of the act of Congress, 17 February, 1864, ch. 79, is simply a conscription of free negroes for certain duties pertaining to military service. *Page 283 
2. That it is within the scope of authority belonging to the War (440) Department, incidental to the war power, to place men, and of course free negroes, in the army, in any position where they may be deemed most safe from improper influences, and for which they may be deemed best fitted.
3. If the War Office can do this as an incident to the power to organize the army, a fortiori, may it be done by Congress, which, of right, declares the war, and authorizes the raising of the army. In the latter, the power must be the more complete and perfect.
4. That it was not only the right of the Congress to dispose of the negro conscripts as the act prescribes, but there was also a fitness and propriety in such disposition, arising out of the condition of society amongst us, and all previous legislation in respect to the negro race.
Judgment of this Court, in accordance with the judgment of the court below, that the petitioner be remanded to the custody of the officer, and that he pay the costs of this proceeding, to be taxed by the clerk.